UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SPLITROCK PROPERTIES, INC., a South Dakota corporation, | ) ) ) | CIV. 08-4172-KES |
| Plaintiff and Counterclaim Defendant, | ) ) ) ) | |
| vs. | ) ) | |
| QWEST COMMUNICATIONS CORPORATION, a Delaware corporation, | ) ) ) ) ) | ORDER STAYING CASE AND REFERRING SEVERAL ISSUES TO FEDERAL COMMUNICATIONS COMMISSION |
| Defendant and Third-Party Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| FREE CONFERENCING CORP., a Nevada corporation; and ALLIANCE COMMUNICATIONS COOPERATIVE, INC., a South Dakota corporation, | ) ) ) ) ) ) | |
| Third-Party Defendants. | ) | |

This case is one of several similar cases pending in the District of South

Dakota. This court has stayed five of these cases and referred specific issues

to the Federal Communications Commission (FCC) pursuant to the primary

jurisdiction doctrine. Although none of the parties in the present case have

moved the court to stay the action and refer specific issues to the FCC, the

court ordered the parties to address whether this case should be stayed and

referred to the FCC. Plaintiff, Splitrock Properties, Inc. (Splitrock), and

defendant, Qwest Communications Corporation, now known as Qwest

Communications Company, LLC (Qwest), assert that referral is not appropriate,

at least not at this time.  Third-party defendant, Free Conferencing Corp. (Free

Conferencing), supports referral of specific issues to the FCC, or in the

alternative, a stay of the case during the pendency of the referral in Splitrock v.

Sprint, Civ. 09-4075.  Third-party defendant, Alliance Communications

Cooperative, Inc. (Alliance), did not file a brief on the referral issue.  Despite the

opposition of Splitrock and Quest, the court finds that referral of certain issues

to the FCC is called for under the primary jurisdiction doctrine.

## BACKGROUND

### A.    History of the Present Case

Splitrock brought this action to recover amounts allegedly due under its

federal and state tariffs.  Splitrock, an incumbent local exchange carrier (ILEC)

based in South Dakota, alleges that it provided originating and terminating

access services to Qwest, an interexchange carrier (IXC), and billed Qwest the

applicable rates set forth in Splitrock's interstate access tariff filed with the

FCC and intrastate access tariff filed with the South Dakota Public Utilities

Commission (SDPUC).[1]  Splitrock alleges that Qwest has failed to pay the

---

[1] By way of background, there are two types of telecommunications
providers, LECs and IXCs.  LECs provide the service and own the hardware
that connects to individual customers in their local areas.  By contrast, IXCs,
commonly known as long-distance carriers, own the hardware that connects
different local carriers.  When an individual makes a long-distance telephone
call, the call is originated on wires and facilities owned by the LEC serving the
individual making the call and the call is terminated over wires and facilities

invoices and as a result owes Splitrock an amount to be proven at trial.

Splitrock filed suit against Qwest alleging breach of contract based on Qwest's

failure to pay the access charges set out in Splitrock's federal and state tariffs,

breach of implied contract, and unjust enrichment. The court dismissed

Splitrock's breach of implied contract and unjust enrichment claims.

Qwest denies that it failed to pay switched access charges for services

provided pursuant to Splitrock's tariffs on the ground that the services

provided by Splitrock do not qualify as "switched access service," as that term

is defined in Splitrock's tariffs. Qwest's argument is based on the nature of the

traffic at issue, which was originated by Qwest's long-distance customers and

terminated to several companies that provide free telephone services such as

---

owned by the LEC serving the individual receiving the call. IXCs pay
"originating" and "terminating" access charges to the LECs that serve
individuals who initiate and receive long-distance calls, respectively.

LECs are further divided into ILECs and competitive local exchange
carriers (CLECs). "ILECs . . . operated as monopolies in a given area until the
local phone service market was opened by the Telecommunications Act of
1996, which provided for the emergence of new LECs, the CLECs, to compete
with the so-called 'Baby Bells.' " Advamtel, LLC v. AT&T Corp., 118 F. Supp. 2d
680, 681 (E.D. Va. 2000). ILECs are required to file and maintain tariffs
setting the rate for access service with the FCC (for purely interstate
communications) or the applicable state utility commission (for intrastate
communications). In re Establishing Just & Reasonable Rates for Local
Exchange Carriers, 2007 WL 2872755, 22 F.C.C.R. 17989, ¶ 2 (2007) (notice of
proposed rulemaking). In general, CLECs may file interstate access tariffs if
the rate for access service is no higher than the rate charged for such services
by the competing ILEC. Id. at ¶ 10. CLECs may negotiate higher rates with
IXCs. Id. Special rules apply to rural CLECs. Id.

conference calling, chat-line, and similar services.[2]  Qwest also alleges that

Splitrock and Alliance, Splitrock's parent company, participated in a "traffic

pumping scheme" with the free calling providers under which the free calling

providers stimulated long-distance calls by offering various calling services to

the public free of charge.  When a call was made from one of Qwest's long-

distance customers to one of the free calling providers, Splitrock routed the call

to or through equipment owned by the free calling provider or provided by

Splitrock, charged Qwest the terminating switched access charge for delivering

that call, and paid a portion of the charge to the free calling provider.

Qwest counterclaimed against Splitrock and Alliance, alleging unjust and

unreasonable practices in violation of 47 U.S.C. § 201(b), violation of 47 U.S.C.

§ 203(c), illegal discrimination under South Dakota law, unlawful cross-

subsidization under 47 U.S.C. § 254(k), failure to comply with 47 U.S.C. § 223,

unfair competition, breach of contract, civil conspiracy, and unjust enrichment

and requesting declaratory relief.  Qwest also named Free Conferencing, a free

calling provider, as a defendant on its unfair competition, civil conspiracy, and

unjust enrichment counterclaims.  Free Conferencing, in turn, counterclaimed

against Qwest alleging tortious interference with business relations, unjust and

unreasonable practices in violation of § 201(b), and violation of 47 U.S.C.

---

[2] The court will refer to these companies collectively as "free calling providers" or "conference calling companies."

4

§ 202(a).  Qwest moved to dismiss Free Conferencing's counterclaims.  This motion is still pending.

**B.     Related Cases**

This case is one of a number of cases pending in this court and in other courts involving a dispute between an LEC and an IXC regarding access charges associated with traffic delivered to free calling providers.  In each of these cases, an LEC claims that an IXC has wrongfully refused to pay terminating access charges for services performed pursuant to the LEC's tariffs and requests compensation under breach of contract, breach of implied contract, and/or unjust enrichment theories.  In each case, the IXC claims that the services provided were not covered by the applicable tariffs because the LEC did not "terminate" the calls and the free calling providers were not "end users" within the meaning of the tariffs.  Many of the IXCs also claim that the applicable LEC engaged in unlawful "traffic pumping."

The following cases are pending in the District of South Dakota: Northern Valley Communications, LLC v. MCI Communications Services, Inc. d/b/a Verizon Business Services, Civ. 07-1016-KES;[3] Sancom, Inc. v. Sprint Communications Co., Civ. 07-4107-KES; Sancom, Inc. v. Qwest Communications Co., Civ. 07-4147-KES; Northern Valley Communications, LLC v. Sprint Communications Co., Civ. 08-1003-KES; Sancom, Inc. v. AT&T

_____

[3] Northern Valley v. MCI, Civ. 07-1016 is consolidated with Sancom, Inc. v. MCI Communications Services, Inc., d/b/a Verizon Business Services, Civ. 07-4106.

Corp., Civ. 08-4211-KES; <u>Northern Valley Communications L.L.C. v. Qwest Communications Co.</u>, Civ. 09-1004-CBK; and <u>Splitrock Properties, Inc. v. Sprint Communications Co.</u>, Civ. 09-4075-KES.  Five of these cases have been stayed pending referral of several issues to the FCC, and a motion to stay and refer is pending in one other.[4]

And, based on information available to the court, there are currently nine similar cases pending in the United States District Court for the Southern District of Iowa, one case pending in the United States District Court for the Northern District of Iowa, three cases pending in the United States District Court for the District of Minnesota, two cases pending in the United States District Court for the Southern District of New York, two cases pending in the United States District Court for the Western District of Kentucky, and one case pending in the United States District Court for the Southern District of California.  Several of these cases have been stayed pending referral of specific issues to the FCC.  <u>See</u> <u>Qwest Commc'ns Co. v. Tekstar Commc'ns, Inc.</u>, Civil File No. 10-490 (MJD/SRN), Docket 80 (D. Minn. July 12, 2010); <u>Tekstar Commc'ns, Inc. v. Sprint Commc'ns Co.</u>, Civil No. 08-1130 (JNE/RLE), 2009 WL 2155930 (D. Minn. July 14, 2009); <u>All Am. Tel. Co., Inc. v. AT&T, Inc.</u>, 07 Civ. 861 (WHP), Docket 88 (S.D.N.Y. Jan. 19, 2010); <u>see also</u> <u>Bluegrass Tel.</u>

---

[4] The following cases have been stayed pending referral of specific issues to the FCC: <u>Sancom v. Sprint</u>, Civ. 07-4107-KES; <u>Sancom v. Qwest</u>, Civ. 07-4147-KES; <u>Northern Valley v. Sprint</u>, Civ. 08-1003-KES; <u>Sancom v. AT&T</u>, Civ. 08-4211-KES; and <u>Splitrock v. Sprint</u>, Civ. 09-4075.  A motion to stay and refer is pending in <u>Northern Valley v. Qwest</u>, Civ. 09-1004-CBK.

Co., Inc. v. Qwest Commc'ns Co., No. 4:09-CV-70-M, Docket 31 (W.D. Ky. Mar. 26, 2010) (staying case pending resolution of referrals in District of South Dakota, District of Minnesota, and Southern District of New York cases).  But see North County Commc'ns Corp. v. Verizon Global Networks, Inc., 685 F. Supp. 2d 1112, 1117 (S.D. Cal. 2010) (denying motion to refer Verizon's counterclaims pursuant to primary jurisdiction doctrine).  Motions to stay and refer certain issues to the FCC are pending in several of the Southern District of Iowa cases.

### C.    Farmers

Similar cases are also pending before various regulatory agencies, the most significant of which is Qwest Communications Corp. v. Farmers & Merchants Mutual Telephone Co. (Farmers), which is pending before the FCC. In Farmers, Qwest filed a complaint against Farmers and Merchants Mutual Telephone Company (Farmers), an ILEC in Iowa, alleging that Farmers violated § 201(b) by earning an excessive rate of return as a result of its plan to increase dramatically the amount of terminating access traffic delivered to its exchange via agreements with conference calling companies.  Qwest Commc'ns Corp. v. Farmers & Merchants Mutual Tel. Co., 2007 WL 2872754, 22 F.C.C.R. 17973, ¶ 1 (2007) (memorandum opinion and order) ("Farmers I").  Qwest also alleged that Farmers violated § 203(c) and § 201(b) by assessing switched access charges for services that were not switched access.  Id.  In October 2007, the FCC issued its memorandum opinion and order in Farmers I, ruling that

Farmers violated § 201(b) by receiving an unlawfully high rate of return, but declining to award Qwest damages because Farmers' tariff was deemed lawful. Id. at ¶¶ 25-26.  The FCC also rejected Qwest's argument that Farmers violated § 203(c) and § 201(b) by imposing terminating access charges on traffic that Farmers did not, in fact, terminate because, the FCC found, Farmers did "terminate" the traffic and the conference calling companies were "end users" as defined in Farmers' tariff.  Id. at ¶¶ 30, 35.  Qwest filed a petition to reconsider challenging various aspects of Farmers I.

In January 2008, the FCC granted in part Qwest's petition for partial reconsideration based on Qwest's assertions that Farmers falsely represented that the conference calling companies purchased interstate End User Access Service and paid the federal subscriber line charge and that Farmers backdated contract amendments and invoices to make it appear that the conference calling companies had been purchasing tariffed services.  Qwest Commc'ns Corp. v. Farmers & Merchants Mutual Tel. Co., 2008 WL 246393, 22 F.C.C.R. 1615, ¶¶ 3, 6 (2008) (order on reconsideration).  The FCC stated that it granted this motion for partial reconsideration because its finding in Farmers I that the conference calling companies were end users under Farmers' tariff was based on the above-mentioned representations made by Farmers.  Id. at ¶ 6.  The FCC ordered Farmers to produce all of the documents it produced in a related state utilities board proceeding, including documents

relating to the decision to backdate contract amendments and invoices.  Id. at ¶ 8.

In November 2009, the FCC issued its second order on reconsideration and ruled that the evidence brought to light pursuant to Qwest's petition for reconsideration warranted a change in its original ruling and compelled the conclusion that Farmers violated § 203(c) and § 201(b).  Qwest Commc'ns Corp. v. Farmers & Merchants Mutual Tel. Co., 2009 WL 4073944, 24 F.C.C.R. 14801, ¶ 1 (FCC Nov. 25, 2009) (second order on reconsideration) ("Farmers II").[5]  The FCC found that the conference calling companies did not subscribe to the services offered under Farmers' tariff, so they were neither "customers" nor "end users" within the meaning of the tariff, and Farmers was not entitled to charge Qwest switched access charges.  Id. at ¶ 10.  As a result, the FCC found that Farmers' practice of charging Qwest access charges for the traffic relating to the conference calling companies was unjust and unreasonable in violation of § 201(b).  Id. at ¶ 26.  The FCC stated that the amount of any damages would be calculated in a separate proceeding and suggested that its ruling that the services Farmers provided did not qualify as "switched access

---

[5] Qwest did not challenge the FCC's finding in Farmers I that Farmers terminated the traffic at issue, so Farmers II did not address this issue. Farmers II, 24 F.C.C.R. 14801, at ¶ 6 n.29.

According to Free Conferencing, the FCC's decision in Farmers II is under appeal at the United States Court of Appeals for the District of Columbia Circuit.

services" under Farmers' tariff did not mean that Farmers was entitled to no compensation for these services.  Id. at ¶ 24 n.96.

## DISCUSSION

"Primary jurisdiction is a common-law doctrine that is utilized to coordinate judicial and administrative decision making."  Access Telecomms. v. Southwestern Bell Tel. Co., 137 F.3d 605, 608 (8th Cir 1998).  The doctrine "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body."  Alpharma, Inc. v. Pennfield Oil Co., 411 F.3d 934, 938 (8th Cir. 2005) (internal quotation and citation omitted).

There is no fixed formula for deciding whether to apply the doctrine of primary jurisdiction.  Access Telecomms., 137 F.3d at 608 (citing United States v. Western Pac. R.R. Co., 352, U.S. 59, 64 (1956)).  Rather, the applicability of the doctrine in any given case depends on "whether the reasons for the doctrine are present and whether applying the doctrine will aid the purposes for which the doctrine was created."  Id.  The Eighth Circuit has identified two main reasons and purposes for the doctrine: first, and most common, "the use of agency expertise in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion," and second, the "promot[ion] of uniformity and consistency within the particular field of regulation."  Alpharma, 411 F.3d at 938 (internal

quotation omitted); <u>Access Telecomms.</u>, 137 F.3d at 608; <u>see also</u> <u>United States</u> <u>v. McDonnell Douglas Corp.</u>, 751 F.2d 220, 224 (8th Cir. 1984) ("The doctrine of primary jurisdiction . . . should seldom be invoked unless a factual question requires both expert consideration and uniformity of resolution." (internal quotation and citation omitted)). The Eighth Circuit warns that the doctrine "is to be 'invoked sparingly, as it often results in added expense and delay.' " <u>Alpharma</u>, 411 F.3d at 938 (quoting <u>Red Lake Band of Chippewa Indians v.</u> <u>Barlow</u>, 846 F.2d 474, 477 (8th Cir. 1988)).

The primary jurisdiction doctrine should be applied when the reasons for the doctrine are present even if the parties have not raised the issue. This is because "the doctrine exists for the proper distribution of power between judicial and administrative bodies and not for the convenience of the parties." <u>Red Lake Band of Chippewa Indians</u>, 846 F.2d at 476. When the primary jurisdiction doctrine applies, the "district court has discretion either to [stay the case and] retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." <u>Access Telecomms.</u>, 137 F.3d at 609 (internal quotation and citation omitted, alteration in original).

In similar access charge cases, the court has referred three issues to the FCC: (1) whether the LEC is entitled to collect interstate switched access charges it has billed to the IXC for calls to numbers assigned to free calling providers; (2) in the event the services provided by the LEC to the IXC do not qualify as switched access service under the LEC's applicable interstate access

tariff, determination of the proper classification of these services, whether such services are subject to federal tariffing requirements, and whether the LEC is entitled to obtain compensation for these services; and (3) in the event that the services provided by the LEC to the IXC do not qualify as switched access service under the LEC's applicable interstate access tariff, but the LEC is otherwise entitled to compensation for these services, determination of a reasonable rate for these services. The court finds that the reasons for applying the primary jurisdiction doctrine are present in this case and that applying the doctrine will aid the purposes for which the doctrine was created with respect to each issue.

### A.    Application of Tariff

The first issue the court considers referring to the FCC is the question of whether the service that Splitrock provided with respect to the free calling provider traffic at issue in this case qualifies as "switched access service" within the meaning of Splitrock's interstate access tariff. This is essentially a tariff interpretation and enforcement question. An action to enforce a tariff is properly brought before a court. Access Telecomms., 137 F.3d at 609. "Ordinarily, the construction of a tariff is a matter of law for the Court, being no different than the construction of any other written document." United States v. Great N. Ry. Co., 337 F.2d 243, 246 (8th Cir. 1964). But where " 'words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper

application,' . . . the issue should first go to the appropriate administrative agency." Access Telecomms., 137 F.3d at 609 (quoting Western Pac., 352 U.S. at 66). "The reason is plainly set forth: such a 'determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of [the regulated area] is indispensable, and such acquaintance is commonly to be found only in a body of experts.'" Western Pac., 352 U.S. at 66 (quoting Great N. Ry. Co. v. Merchants' Elevator Co., 259 U.S. 285, 291 (1922)).

Where interpretation of the relevant tariff is straightforward, the primary jurisdiction doctrine does not apply. For example, in National Communications Ass'n, Inc. v. American Telephone & Telegraph Co., 46 F.3d 220, 223 (2d Cir. 1995), the threshold question of whether the plaintiff qualified for services under the tariff in turn depended on the factual question of whether the plaintiff had timely paid its bills. The Second Circuit reasoned that this issue could be resolved by the district court in a reasonable amount of time and did not require the FCC's policy experience or specialized knowledge. Id. Thus, the primary jurisdiction doctrine did not apply. Id. at 225.

In contrast, where the interpretation of the tariff requires interpretation of technical terms or specialized knowledge, referral under the primary jurisdiction doctrine is appropriate. For example, in Access Telecommunications, 137 F.3d at 609, the Eighth Circuit reasoned that the plaintiff's claim that the defendant carrier violated the plaintiff's tariff was

properly referred to the FCC because application of the tariff would cause the court "to become embroiled in the technical aspects" of voice grade 7, the service at question, and the FCC had more expertise than the courts on the relevant issues of circuit designs, signal transmission, noise attenuation, and echo return loss.[6] Similarly, in United States v. Great Northern Railway Co., 337 F.2d at 246-47, the Eighth Circuit found that the phrase "transit privileges" in the relevant tariff "had a particular connotation in the rail transportation field, being a generic term requiring specific definition" and as such was a matter for primary determination by the applicable regulatory agency.[7]

Here, application of Splitrock's switched access tariff requires interpretation of words used in a technical sense and consideration of extrinsic evidence relating to topics within the expertise of the FCC. Under Splitrock's interstate access tariff,

Switched Access Service, which is available to customers for their use in furnishing their services to end users, provides a two-point

_____

[6] In Access Telecommunications, 137 F.3d at 609, the plaintiff's tariff claim required determination of the reasonableness of the defendant carrier's classification, a determination clearly within the FCC's authority under § 201(b). But the Eighth Circuit did not indicate that the propriety of the application of the primary jurisdiction doctrine depended on the presence of a reasonableness determination.

[7] In United States v. Great Northern Railway Co., 337 F.2d at 247-48, the Eighth Circuit found that there was no need to refer the case to the Interstate Commerce Commission because the Commission had sufficiently defined the term in previous opinions to which the district court was required to give the greatest deference and weight.

> communications path between a customer designated premises
> and an end user's premises. . . . Switched Access Service provides
> for the ability to originate calls from an end user's premises to a
> customer designated premises, and to terminate calls from a
> customer designated premises to an end user's premises in the
> LATA where it is provided.

National Exchange Carrier Association, Inc. (NECA) Tariff F.C.C. No. 5, § 6.1.[8]

Thus, in order for the services provided by Splitrock to qualify as "switched access services," Splitrock must terminate the calls to an "end user's premises." That is, the free calling providers must qualify as "end users." Splitrock's interstate access tariff defines "end user" as "any customer of an interstate or foreign telecommunications service that is not a carrier." Id. at § 2.6. "Customer," in turn, is defined as "any individual, partnership, association, joint-stock company, trust, corporation, or governmental entity or other entity which subscribes to the services offered under this tariff, including both Interexchange Carriers (ICs) and End Users." Id. Splitrock's interstate access tariff does not define "subscribe."

Determination of whether the free calling providers qualify as "end users" under Splitrock's interstate access tariff would embroil the court in the technical aspects of switched access service. In Farmers II, the FCC interpreted the same tariff language at issue here. See Farmers II, 24 F.C.C.R.

---

[8] Splitrock is a concurring carrier in Alliance Communications Cooperative, Inc. Tariff F.C.C. No. 1, which references the NECA Tariff F.C.C. No. 5 for its terms and conditions. See Splitrock v. Sprint, Civ. 09-4075-KES, Docket 40 at 4. Portions of the NECA Tariff F.C.C. No. 5 are available in Civ. 09-4075-KES at Docket 40.

14801, at ¶ 10 (setting out definitions of switched access service, end user, and customer). Thus, the FCC's analysis in <u>Farmers II</u> sheds light on the issues the court would be called on to resolve if it interpreted Splitrock's interstate access tariff in this case. In <u>Farmers II</u>, the FCC considered the different connections Farmers provided to the conference calling companies versus the customers of its tariffed service. The FCC explained that "Farmers provided the conference calling companies with high-capacity DS3 trunks that fed into trunk-side connections, to a brand new 'soft switch' that Farmers purchased specifically to handle traffic bound for the conference calling companies." <u>Id.</u> at ¶ 13. Farmers used a Nortel DMS-10 circuit switch to serve all of its other customers. <u>Id.</u> The import and meaning of the different types of connections provided to different customers is an issue the FCC is more qualified than the court to consider. <u>See</u> <u>Access Telecomms.</u>, 137 F.3d at 609 (explaining that the FCC has more expertise than the courts on matters such as circuit designs, signal transmissions, noise attenuation, and echo return loss).

The FCC also found that Farmers' agreements with the conference calling companies did not resemble traditional agreements for the provision of switched access services in that the agreements included exclusivity clauses and other unique terms not available under Farmers' tariff, required Farmers to pay the conference calling companies a given and unique sum per minute of traffic that Farmers delivered, and obligated each conference calling company to generate different amounts of traffic. <u>Farmers II</u>, 24 F.C.C.R. 14801, at

¶ 14.  The FCC is uniquely qualified to compare the terms of an agreement between an LEC and a conference calling company with the terms of a traditional agreement for the provision of tariffed access services because of the FCC's experience in the field.

Similarly, the FCC considered Farmers' failure to enter the conference calling companies' account information into its customer billing systems in accordance with its standard business practices for tariffed services, Farmers' failure to bill the conference calling companies for monthly services, Farmers' conduct throughout its business relationships with the conference calling companies, and the flow of money between Farmers and the conference calling companies.  Id. at ¶¶ 12 n.49, 16, 17.  An adequate appreciation of the relevance of these and other facts relating to an LEC's relationship with a conference calling company requires acquaintance with the many intricate facts of the normal practices and regulatory regime for switched access service.

Based on the FCC's analysis in Farmers II and the specific and technical meaning of the terms "switched access service," "end user," "customer," and "subscribe," the court finds that the issue of whether the services Splitrock provided to Qwest in this case qualify as "switched access services" under Splitrock's interstate tariff is a matter that requires the expertise of the FCC. "The courts, while retaining the final authority . . . should avail themselves of the aid implicit in the agency's superiority in gathering the relevant facts and in

marshaling them into a meaningful pattern." <u>United States v. Great N. Ry. Co.</u>, 337 F.2d at 246 (internal quotation and citation omitted).

Splitrock and Qwest argue that the guidance provided by the FCC in <u>Farmers II</u> is sufficient to avail the court of the FCC's expertise so that referral of the issue of the application of Splitrock's tariff to the services at question in this case is unnecessary. Indeed, the Supreme Court has explained, "[c]ertainly there would be no need to refer the matter of [tariff] construction to the Commission if that body, in prior releases or opinions, has already construed the particular tariff at issue or has clarified the factors underlying it." <u>Western Pac.</u>, 352 U.S. at 69; <u>see also</u> <u>Great N. Ry. Co.</u>, 337 F.2d at 247-48 (explaining that where Interstate Commerce Commission had sufficiently defined "transit privileges" in previous opinions, the primary jurisdiction doctrine had been satisfied and there was no need to refer the case to the Commission).

Here, the court finds that <u>Farmers II</u> does not provide sufficient guidance to render referral unnecessary. <u>Farmers II</u> made clear that the application of the tariff is a fact-specific question. The type of connection and nature of the relationship between Splitrock and the free calling providers may differ from the facts of <u>Farmers II</u> so that the FCC's expertise is still necessary in this case. Qwest argues that the court need not understand the particular types of switches or connections used in this case to appreciate that Splitrock used different types of connections for the free calling providers, but the court finds

18

that the FCC's expertise is necessary to identify these differences and

understand their meaning in the context of determining whether the free

calling providers are end users.  Further, many of the details of Farmers' billing

practices and conduct were redacted from the FCC's opinion in Farmers II, and

as a result, the opinion provides the court with the FCC's conclusion rather

than many of the key facts supporting that conclusion.  See Farmers II, 24

F.C.C.R. 14801, at ¶¶ 16, 18-20 (redacting confidential information regarding

Farmers' billing practices, Farmers' efforts to backdate and amend its

agreements, and Farmers' relationship with the conference calling companies).

Thus, there remain technical issues on which the FCC has not provided

sufficient guidance.  As the District of Minnesota explained, "the Court

anticipates that review of the myriad factors involved in the process of

establishing tariffs will be significant to gauging the scope of [plaintiff-LEC's]

tariff." Tekstar, 2009 WL 2155930, at *2 (citing In re Establishing Just &

Reasonable Rates for Local Exchange Carriers, 2007 WL 2872755, 22 F.C.C.R.

17989, 17992-94 (2007) (notice of proposed rulemaking); 47 C.F.R. § 61.26).

Despite Splitrock's and Qwest's assertion that Farmers II provides the court

with sufficient guidance, the court finds that this opinion does not obviate the

need for a primary jurisdiction referral of the tariff application issue in this

case.

Qwest also argues that referral of the tariff application issue is

unwarranted because the Iowa Utilities Board (IUB) provided guidance on this

19

issue in <u>Qwest Communications Corporation v. Superior Telephone Cooperative</u>. In <u>Superior</u>, the IUB considered intrastate traffic involving many of the same parties as <u>Farmers I</u> and <u>Farmers II</u> and found that the conference calling companies did not subscribe to the services offered in the LECs' intrastate access tariffs and therefore were not end users under the tariffs. Docket No. FCU-07-2 at 24, 2009 WL 3052208, at *10 (Iowa Utils. Bd. Sept. 21, 2009) (final order), <u>withdrawn in part by</u> 2009 WL 4571832 (Iowa Utils. Bd. Dec. 3, 2009) (order granting motion and granting application for rehearing, in part). The IUB did not reveal the specifics of a substantial amount of the evidence in the case, and as a result the IUB's final order does not provide sufficient guidance on the technical and factual issues relating to the tariff application issue. <u>See</u> Docket No. FCU-07-2 at 15, 2009 WL 3052208, at *6 ("Pursuant to [protective] agreements, the Board has received a substantial amount of the evidence as confidential filings. . . . The Board has considered all of the evidence in the record in reaching its decision, but in recognition of the parties' protective agreements, this order will not reveal the specifics of any evidence submitted as confidential."). Moreover, as a decision of an out-of-state administrative agency, the IUB's final order is not binding on this court. Thus, the IUB's final order in <u>Superior</u> does not render referral of the tariff application issue unnecessary in this case. Similarly, the Utah Public Service Commission's analysis of whether a carrier provided local exchange service within the meaning of Utah law, <u>In re Consideration of the Rescission,</u>

Alteration, or Amendment of the Certificate of Authority of All American to

Operate as a Competitive Local Exchange Carrier within the State of Utah,

Docket No. 08-2469-01, 2010 WL 1731201 (Utah Pub. Serv. Comm'n Apr. 26,

2010), does not provide sufficient guidance to overcome the need for FCC

expertise on the issue of whether Splitrock's interstate access tariff applies to

the traffic at issue in this case.

Referral of the tariff application issue would also promote uniformity and

consistency within the particular field of regulation.  Because there are

currently about two dozen cases pending in federal courts across the country

involving the issue of whether the connection of long-distance calls through an

LEC's facilities to conference calling companies constitutes "switched access

service" under the applicable access tariffs, the court finds that the potential

for inconsistent or contradictory rulings on this issue is great.  Indeed, the FCC

and the IUB have taken arguably inconsistent approaches to part of the tariff

application analysis.  In Farmers I, the FCC applied the so-called "end-to-end"

test for determining where a call terminates and found that the free calling

provider traffic at issue terminated at the conference call bridge located in

Farmers' exchange and that the bridge was an "end user's premises" under the

applicable tariff.  22 F.C.C.R. 17973, at ¶¶ 32-32, 35-36.  In contrast,

considering some of the same traffic, the IUB found that the traffic did not

terminate at an end user's premises.  Docket No. FCU-07-2 at 39-40, 2009 WL

3052208, at *17-*18.  Moreover, the IUB applied the FCC's "end-to-end" test

and found that international, calling card, and prerecorded playback calls did not terminate in the LECs' exchanges. Docket No. FCU-07-2 at 42-43, 2009 WL 3052208, at *19. Qwest argues that <u>Superior</u> is entirely consistent with <u>Farmers I</u> because each case involved different traffic. Without attempting to resolve this factual question or reconcile the FCC's and IUB's approaches to the issue of where traffic terminates under the "end-to-end" analysis, the court finds that the uncertainty created by the potential inconsistency of the FCC's and IUB's opinions shows that the risk of inconsistent and contradictory rulings on the tariff application issue is great, even in light of the guidance provided by existing agency decisions. The purposes of the primary jurisdiction doctrine support referral of the tariff application issue.

**B.      Classification of Services**

The second issue the court considers referring to the FCC is, if Splitrock's interstate access tariff does not apply to delivery of calls to the free calling providers, what is the proper legal classification of these services and is Splitrock entitled to compensation for them. Splitrock objects to referral of the tariff application issue, but argues that if the court must consider whether the services provided by Splitrock are otherwise compensable, the FCC is the appropriate forum to determine this issue.

Qwest argues that the court cannot refer the issue of how Splitrock's services should be classified if they do not fall under Splitrock's interstate access tariff because Splitrock's non-tariff theories of recovery have been

22

dismissed.  Qwest correctly notes that the court dismissed Splitrock's breach of implied contract and unjust enrichment claims pursuant to the filed rate doctrine.  See Docket 28 at 3.  It does not follow, however, that the court cannot refer to the FCC issues that may implicate these previously dismissed claims.  Contrary to Qwest's assertion, a primary jurisdiction referral does not refer entire **claims** to the FCC.  Rather, such a referral seeks the FCC's guidance on **issues** within its expertise.  Thus, while the FCC's response to the classification of services issue may implicate Splitrock's state-law breach of implied contract and unjust enrichment claims, the fact that these claims have been dismissed does not bar the court from referring this issue.  Indeed, in a related case, this court referred the classification of services issue to the FCC despite the fact that the plaintiff-LEC's unjust enrichment claim had been dismissed and declined to rule on the plaintiff-LEC's motion to reinstate this claim prior to the primary jurisdiction referral.  Sancom, Inc. v. Qwest Commc'ns Corp., Civ. 07-4147-KES, Docket 246 at 30-31, 2010 WL 960005, at *12-*13 (D.S.D. Mar. 12, 2010).  And as further explained below, the uncertainty created by the court's dismissal of Splitrock's non-tariff claims pursuant to the filed rate doctrine, contradictory rulings by other courts within this district, and indications in Farmers II that an LEC is entitled to receive some compensation for services that do not fall within its interstate access tariff supports referral of the classification of services issue, rather than barring such referral.

Considering the application of the primary jurisdiction doctrine to the classification of services issue, the FCC's expertise is necessary to determine whether Splitrock is entitled to compensation for services not covered by its tariffs. The FCC suggested in Farmers II that an LEC may obtain compensation from an IXC to which it provided services even though the services did not qualify as "switched access services" under the LEC's access tariff. In Footnote 96, the FCC stated,

> This is not to say that Farmers is precluded from receiving any compensation at all for the services it has provided to Qwest. See, e.g., New Valley Corp. v. Pacific Bell, Memorandum Opinion and Order, 15 FCC Rcd 5128, 5133, ¶ 12 (2000) (fact that a carrier's tariff did not include rates or terms governing the service provided did not mean that the customer was entitled to damages equal to the full amount billed; rather "where, as here, the carrier had no other reasonable opportunity to obtain compensation for services rendered . . . a proper measure of the damages suffered by a customer as a consequence of a carrier's unjust and unreasonable rate is the difference between the unlawful rate the customer paid and a just and reasonable rate"), aff'g New Valley Corp. v. Pacific Bell, Memorandum Opinion and Order, 8 FCC Rcd 8126, 8127, ¶ 8 (Com. Car. Bur. 1993) (finding no basis in the Supreme Court's "Maislin [decision] or any other court or Commission decision for the conclusion that a customer may be exempt from paying for services provided by a carrier if those services were not properly encompassed by the carrier's tariff"). See also America's Choice, Inc. v. LCI Internat'l Telecom Corp., Memorandum Opinion and Order, 11 FCC Rcd 22494, 22504, ¶ 24 (Com. Car. Bur. 1996) (holding that "a purchaser of telecommunications services is not absolved from paying for services rendered solely because the services furnished were not properly tariffed").

Farmers II, 24 F.C.C.R. 14801, at ¶ 24 n.96. The FCC has not indicated the basis for compensation of the LEC, whether the LEC's termination of calls to the conference calling companies was subject to federal tariffing requirements,

or how such calls should be classified within the regulatory scheme. Given the FCC's role in regulating the environment in which LECs provide tariffed access services, see In re Establishing Just & Reasonable Rates for Local Exchange Carriers, 22 F.C.C.R. 17989, at ¶ 6 (explaining alternative means for rate-of-return LECs to file interstate access tariffs under FCC rules), and the uncertainty created by Footnote 96, these issues are properly determined by the FCC.

Referral of the issue of the classification of the services provided by Splitrock also promotes uniformity and consistency. There is disagreement among courts in this district over whether an LEC may recover under an unjust enrichment theory. Compare Sancom, Inc. v. Qwest Commc'ns Corp., 643 F. Supp. 2d 1117, 1125-27 (D.S.D. 2009) (finding unjust enrichment claim to be barred by the filed rate doctrine) and Splitrock Props., Inc. v. Qwest Commc'ns Corp., Civ. 08-4172-KES, Docket 28 at 3, 2009 WL 2827901 (D.S.D. Aug. 28, 2009) (same) with Northern Valley Commc'ns, LLC v. Qwest Commc'ns Corp., 659 F. Supp. 2d 1062, 1070 (D.S.D. 2009) (finding that filed rate doctrine does not defeat unjust enrichment claim where it is alleged that tariff does not apply). While the court does not refer this legal question to the FCC, the inconsistent rulings show the need for clarification by the FCC on whether services provided by an LEC with respect to free calling provider traffic are subject to tariff requirements, where these services fall into the regulatory regime, and how an LEC may obtain compensation for these services outside of

25

its tariffs.  The purposes of the primary jurisdiction doctrine support referral of the service classification issue.

### C.     Reasonable Rate

The third question the court considers referring to the FCC is, if Splitrock's interstate access tariff does not apply to the services at issue, but Splitrock is entitled to compensation for these services, what is the reasonable rate.  It is well established that the FCC is specially positioned to determine the reasonableness of rates.  See, e.g., Qwest Corp. v. Scott, 380 F.3d 367, 375 (8th Cir. 2004) (stating that regulating agency has authority to determine reasonableness of rates).  Thus, if Splitrock is entitled to compensation for the services it provided to Qwest outside of its tariffed rate, the FCC has the expertise and experience to determine the appropriate rate.  See Access Telecomms., 137 F.3d at 609 (stating that FCC has statutory authority to make reasonableness determinations).

Qwest argues that the issue of a reasonable rate for Splitrock's services should not be referred because the FCC is prohibited from setting rates retroactively.  Qwest's argument seems to be supported by existing FCC opinions.  See ACC Long Distance Corp. v. Yankee Microwave, Inc.,1993 WL 755637, 8 F.C.C.R. 85, ¶ 10 (1993) (memorandum opinion and order) ("The Commission's authority to determine and prescribe just and reasonable rates derives from Section 205 of the Act which authorizes rates to be prescribed only on a prospective basis.").  But as noted, the FCC suggested in Footnote 96

of <u>Farmers II</u> that an LEC may be entitled to some compensation for services it provides to an IXC even if the services do not fall under the LEC's tariff. <u>Farmers II</u>, 24 F.C.C.R. 14801, at ¶ 24 n.96.  In the absence of further analysis from the FCC regarding the basis for such compensation, the court cannot say that the FCC is without jurisdiction to determine an appropriate rate or amount of compensation.  Qwest argues that the opinions cited in Footnote 96 are distinguishable from the circumstances in <u>Farmers II</u> and in this case because they did not involve a collection action by a carrier, so that the FCC cannot rely on these cases to award compensation to Farmers.  As noted, the FCC has not yet set out the legal basis for an award of compensation to Farmers.  As with the classification of services issue, the court finds that the interests of the primary jurisdiction doctrine are best served by allowing the FCC to determine whether, under what basis, and at what rate, an LEC is entitled to be compensated for delivering long-distance traffic to free calling providers on behalf of IXCs like Qwest where the service does not fall under the applicable switched access tariff.

### D.     Conclusion

Overall, the reasons for the primary jurisdiction doctrine are present in this case so that applying the doctrine will aid the purposes for which it was created.  Splitrock and Qwest argue that referral is not appropriate because discovery is not complete and ask that the court delay referring any issues to the FCC until the issues are crystallized through discovery.  But the record

before the court shows that the tariff application, classification of services, and reasonable rate issues should be referred to the FCC pursuant to the primary jurisdiction doctrine at this stage of the case. There is no need to wait for the parties to complete discovery. "[I]f . . . the primary jurisdiction doctrine applies on any set of facts that could be developed by the parties, there is no reason to await discovery, summary judgment, or trial and the application of the doctrine properly may be determined on the pleadings." <u>Davel Commc'ns, Inc. v. Qwest Corp.</u>, 460 F.3d 1075, 1089 (9th Cir. 2006).

Likewise, the court finds no merit to the parties' arguments that the FCC cannot provide a sufficient procedure to resolve the issues in this case. Splitrock suggests that the FCC cannot give each case individualized consideration. But the FCC is in a better position than the court to consider and understand the meaning of the technical issues and relevant facts in this case. <u>See</u> <u>United States v. Great N. Ry. Co.</u>, 337 F.2d at 246 (noting that courts should avail themselves of the agency's superiority in gathering the relevant facts and in marshaling them into a meaningful pattern). Further, the court retains jurisdiction over the case and will have an opportunity to review the FCC's guidance on the referred issues and apply that guidance to the claims in this case. <u>See</u> <u>Reiter v. Cooper</u>, 507 U.S. 258, 268 (1993) ("Referral of the issue to the administrative agency does not deprive the court of jurisdiction."). Referral of the issues described in this order does not deprive Splitrock of individualized consideration of its case.

Similarly, Qwest's argument that the FCC cannot decide the referred issues until the parties have completed discovery in federal court is unavailing. The regulatory agency's discovery rules and pleading requirements are not considerations of the primary jurisdiction doctrine. See Access Telecomms., 137 F.3d at 608 (explaining that primary jurisdiction doctrine should be applied where issue calls for expert consideration and uniformity within the field of regulation). And there is no indication that the parties would be unable to discover the relevant evidence pursuant to the FCC's discovery rules. Even the documents withheld in Farmers, that, once discovered, persuaded the FCC to reverse its decision should have been produced pursuant to the FCC's discovery order. 23 F.C.C.R. 1615, at ¶ 8. The fact that the parties would prefer to develop their case in federal court does not defeat the application of the primary jurisdiction doctrine. "[T]he doctrine exists for the proper distribution of power between judicial and administrative bodies and not for the convenience of the parties." Red Lake Band of Chippewa Indians, 846 F.2d at 476. Further, the fact that the FCC consolidated three of the cases referred to it by this court and designated the case in which discovery was complete as the lead case does not suggest that completed discovery was necessary for the FCC to proceed. Indeed, the FCC did not require that the case in which discovery was complete be designated as the lead case, but rather ordered the IXCs to "decide amongst themselves which IXC will be the complainant in the proceeding." Letter by Deputy Chief, Market Disputes Resolution Division,

Enforcement Bureau, Docket 80-1 at 3 (released May 5, 2010); <u>see also</u> Letter by Deputy Chief, Market Disputes Resolution Division, Enforcement Bureau, Docket 80-1 at 6 (June 2, 2010) (noting that IXCs indicated that they had agreed that Qwest would file the formal complaint).

The court has considered the bifurcated procedure the FCC adopted in the previously-referred cases, the risk that the FCC will send issues back to the court before reaching the classification of services and/or reasonable rate issues, and the added expense and delay that may result from the primary jurisdiction referral, but finds that the need for expert consideration, uniformity, and consistency within this complicated, technical, and dynamic field compels referral of specific issues to the FCC. The court agrees with the Southern District of New York that "[t]his area of telecommunication regulation is in dynamic flux . . . [so] these issues . . . are ripe for determination and clarification by the regulatory agency." <u>All Am. Tel. Co.</u>, 07 Civ. 861 (WHP), Docket 88 at 3 (citing <u>Allnet Commc'n Servs., Inc. v. Nat'l Exchange Carrier Assoc.</u>, 965 F.2d 1118, 1121 (D.C. Cir. 1992)). Because the FCC's input on the tariff application, classification of services, and reasonable rate issues may inform the court's analysis of Qwest's motion to dismiss Free Conferencing's counterclaims, the court declines to rule on the pending motion to dismiss prior to staying the case and referring issues to the FCC. And because the parties' written submissions are sufficient for the court to determine the

primary jurisdiction issue, Qwest's request for oral argument is denied. Therefore, it is

ORDERED that this action is STAYED pending (1) resolution of the dispute by agreement of the parties; (2) a decision on the disputed issues by the FCC pursuant to the referral described below; or (3) further order of the court.

IT IS FURTHER ORDERED that this matter is referred to the FCC for resolution, to the extent the FCC's jurisdiction permits, of the following issues:

(1)     Whether, under the facts of the present dispute between Splitrock and Qwest, Splitrock is entitled to collect interstate switched access charges it has billed to Qwest pursuant to Splitrock's interstate access tariff for calls to numbers assigned to free calling providers.

(2)     In the event that the services provided by Splitrock to Qwest, by which calls placed by Qwest's customers are delivered to free calling providers served by Splitrock, do not qualify as switched access service under Splitrock's applicable interstate access tariff, determination of the proper classification of these services, whether such services are subject to federal tariffing requirements, and whether Splitrock is entitled to obtain compensation for these services.

(3)     In the event that the services provided by Splitrock to Qwest do not qualify as switched access service under Splitrock's applicable interstate access tariff, but Splitrock is otherwise entitled to compensation for these services, determination of a reasonable rate for these services.

IT IS FURTHER ORDERED that Splitrock shall contact the Market Disputes Resolution Division of the FCC to obtain guidance regarding the appropriate method for bringing this matter before the FCC.  Splitrock shall

initiate proceedings as recommended by the Market Disputes Resolution Division within 30 days of the date of this order.  Splitrock is directed to furnish the FCC with a copy of this order as part of its submission.

IT IS FURTHER ORDERED that the parties shall submit a joint report to the court every three months describing the status of the proceeding before the FCC, the first of which shall be filed no later than three months from the date of this order.

Dated July 20, 2010.

BY THE COURT:

/s/ *Karen E. Schreier*

KAREN E. SCHREIER
CHIEF JUDGE